1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
    - - - - - - - - - - - - - - - X
 3
    GOVERNMENT EMPLOYEES INSURANCE :
 4  COMPANY, et al.,                  17-CV-2802(ILG)

 5            Plaintiffs,       :
                                     United States Courthouse
 6        -against-            :      Brooklyn, New York

 7  IGOR MAYZENBERG, et al.,      :
                                     May 14, 2019
 8            Defendants.     :      2:00 o'clock p.m.

 9  - - - - - - - - - - - - - - - X

10                TRANSCRIPT OF MOTION
          BEFORE THE HONORABLE I. LEO GLASSER
11          UNITED STATES SENIOR DISTRICT JUDGE.

12  APPEARANCES:

13  For the Plaintiff GEICO:    RIVKIN, RADLER LLP
                                926 RXR Plaza
14                              Uniondale, NY 11556-0926

15                              BY: MICHAEL A. SIRIGNANO, ESQ.
                                    STEVEN HENESY, ESQ.
16
    For Defendants Mayzenberg,
17  Mingmen, Sanli and Laogong: SCHWARTZ, CONROY & HACK, PC
                                666 Old Country Road, Suite 900
18                              Garden City, NY 11530

19                              BY: MATTHEW J. CONROY, ESQ.

20
    For Defendant T. Dovman:    DINARA MAYLOV, ESQ.
21                              2747 Coney Island Avenue
                                Brooklyn, New York  11235
22
    Court Reporter:             Charleane M. Heading
23                              225 Cadman Plaza East
                                Brooklyn, New York
24                              (718) 613-2643

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.
```

CMH      OCR      RMR      CRR      FCRR

2

1          THE CLERK:  Civil cause for motion.  GEICO, et al.
2     versus Mayzenberg, et al.
3          Counsel, please come forward and state your
4     appearances for the record.
5          MR. SIRIGNANO:  Good afternoon, Your Honor.  My name
6     is Michael Sirignano from the law firm of Rivkin Radler along
7     with associate Steven Henesey.  We represent the plaintiffs
8     collectively known as GEICO.
9          THE COURT:  Good afternoon.
10          MR. HENESEY:  Good afternoon, Your Honor.
11          MR. CONROY:  Good afternoon.  Matthew Conroy and I
12     represent the defendants Igor Mayzenberg, Sanli Acupuncture,
13     Mingmen Acupuncture and Laogong Acupuncture.
14          THE COURT:  Good afternoon.
15          MS. MAYLOV:  Good afternoon, Judge.  I'm Dinara
16     Maylov and I represent Tamilla Dovman.
17          THE COURT:  Good afternoon.  You all may sit down.
18          Does plaintiff want to be heard on these motions for
19     summary judgment?
20          MR. SIRIGNANO:  Yes, Your Honor.  Thank you.
21          THE COURT:  I want to listen to the plaintiffs
22     first.
23          MR. SIRIGNANO:  Plaintiffs have moved for summary
24     judgment, Your Honor --
25          THE COURT:  Stand up and use the mic.

3

1        MR. SIRIGNANO:  Plaintiffs, Your Honor, have moved

2   for summary judgment against all defendants on all claims but

3   only as to a single issue involving defendants' wrongful

4   conduct.  There's a number of items of wrongful conduct but

5   the motion for summary judgment is based on the defendants

6   engaging in a scheme to defraud GEICO by having Mingmen

7   Acupuncture submit bills for acupuncture services that were

8   the product of a patient referral and kickback scheme.

9        Plaintiffs' motion for summary judgment is based on,

10  first, the law of this case and a mountain of undisputed

11  evidence confirming that this patient kickback and referral

12  scheme took place and as you'll find out, there's really no

13  dispute about the key operative facts about this patient

14  kickback and referral scheme.

15       Now, first, as to the law of the case, this court

16  has already held in a memorandum and order dated November 16,

17  2018 that the payment of kickbacks by a healthcare provider

18  like Mingmen Acupuncture renders that provider ineligible to

19  recover benefits under the no fault law and we can talk about

20  that further, but that ruling has already been made in

21  connection with a prior motion that the plaintiffs filed in

22  this case.

23       THE COURT:  Do I understand you to say there is no

24  dispute at all as to whether there were kickbacks for

25  services?  Did I hear that?

4

1          MR. SIRIGNANO:  Yes, you did.  The dispute is not

2     about the operative facts.  They're attempting to raise a

3     dispute but it's -- the entirety of their defense is based on

4     Mr. Mayzenberg's claim that he had an understanding that the

5     payments made to a series of shell companies were from

6     marketing and advertising expenses.  That understanding is not

7     supported by a single objective fact.

8          THE COURT:  But the fact is that there is a dispute

9     as I get it as to whether there were kickbacks.

10          MR. SIRIGNANO:  No.  There's not a dispute as to --

11          THE COURT:  Does Mr. Mayzenberg dispute it at all?

12          MR. SIRIGNANO:  Mr. Mayzenberg disputes the fact

13     that these payments are legally considered to be kickbacks.

14          He doesn't dispute that he made payments for

15     referrals of patients.  He specifically testified repeatedly

16     and he's put no evidence to counter plaintiffs' arguments that

17     he paid monies to have patients sent to medical clinics.  I

18     can go through a series --

19          THE COURT:  Excuse me.  I am a little confused.

20          As I understand, GEICO's claim is that they were

21     being billed for medical services which were either not

22     performed or unnecessarily performed and for services that

23     were obtained by virtue of kickbacks that were made by, as I

24     believe it, the Dovmans or referrals made by the Dovmans and

25     that Mayzenberg claims that the payments that he made were not

5

1    for kickbacks, not for referral of services, but for

2    advertising, consulting and whatever other services Dovman

3    provides.  As I understand it, the dispute is whether he paid

4    for referral services.  He says that he did not.  So when you

5    say there is no dispute about what is the essential fact on

6    which you are basing your claim, I am having trouble

7    understanding that.

8            MR. SIRIGNANO:  There is no genuine dispute that

9    requires a trial because all of the operative facts regarding

10   the payments are undisputed.  It's the characterization of

11   those payments.

12           Now, under the law, Your Honor, under the education

13   law, paying for patient referrals, offering to pay for patient

14   referrals, whether directly or indirectly, is a violation of

15   the law and while Mr. Mayzenberg has submitted an affidavit

16   that contains one sentence saying it's his understanding that

17   certain vague payments were for marketing and advertising,

18   everything else in the case, objectively, is absolutely clear

19   that those payments were made to send patients to the clinics.

20           So if you look at the law which says payments made

21   directly or indirectly, as a matter of law, he can

22   characterize them as his belief but that doesn't change what

23   those payments were for under the law, and he has to have some

24   evidence supporting his understanding, Your Honor.  There is

25   absolutely no evidence supporting his understanding.

1          And very briefly, if I may, because there are

2     clearly undisputed material facts here that they concede that

3     will demonstrate that Mr. Mayzenberg's understanding has no

4     concrete foundation whatsoever, there's not a shred of

5     evidence, and that can be determined through, number one --

6     you know, there's a lot of paper here but there is no dispute

7     about the fact that Mr. Mayzenberg made $389,000 in payments

8     to these Dovman shell companies.

9          There is no dispute that the Dovman shell entities

10    did not conduct any marketing and advertising services.  They

11    admit that.  There's no dispute that the Dovman shell entities

12    did not perform any legitimate business activity.  There's no

13    dispute about that.  There's no dispute about the manner in

14    which Mr. Mayzenberg made the payments and I think this is

15    significant.

16         He testified, and there's no dispute about this,

17    that he made these payments that he says, it was my

18    understanding, to be marketing and advertising, he made these

19    payments when he got a phone call from some complete stranger

20    at his office who told him how much he should be paying and he

21    left those checks, he filled out an amount of the checks

22    without ever, over the course of two years, indicating in the

23    memo line of the check what those checks were for.  He left

24    every single check blank over the course of two years.  Those

25    checks, he just left with, again, complete strangers to pick

1   those checks up from his office.

2          The checks were written to companies not with

3   marketing and advertising names in them.  The checks were

4   written to companies like ML Garbage, MN Surgical Supply, Rig

5   Testing.  That's the manner in which he made these payments.

6          Secondly, there was no evidence -- he never got an

7   invoice.  He admits that.  He admits that in the material

8   statement of facts.  In two years, $389,000 worth of payments,

9   he never got a single invoice from any one of those companies.

10  He also admits that there's not a shred of paper proving any

11  marketing and advertising.  We've asked him.  He has nothing.

12  So all of that is admitted.  He also admits paying someone

13  named Desiree Reid for patient referrals.  Now, again, he says

14  that was an indirect payment for a referral.  He's also paid

15  for-profit medical referral companies.

16         Finally, Your Honor, there's no dispute about the

17  ultimate purpose of the payments.  Now, Mr. Mayzenberg, again,

18  in one line says, well, I know all this evidence exists but

19  it's my understanding that they were supposed to go for

20  marketing and advertising.  But the ultimate purpose of the

21  payments, Mr. Mayzenberg made clear over and over again, he

22  said those payments were to send patients to the clinics.  He

23  said even if the patients had to be found in the garbage and I

24  paid a garbage company to send patients to the clinics, that's

25  why I made the payments.  He said it was his sole concern.

1  Why he made those payments was to send patients to the

2  clinics.

3         So when you add up all of that mountain of evidence,

4  the only thing that we have on the other side is

5  Mr. Mayzenberg saying, well, forget all of that evidence, I

6  kind of believe, I had a vague understanding that, you know, I

7  sent these checks to complete strangers and it was my kind of

8  understanding that they were for marketing and advertising.

9  It's our position that when plaintiffs present a mountain of

10 evidence like this and the only thing in opposition is a

11 single sentence, essentially, two words that it was his

12 understanding, that that is not sufficient to defeat summary

13 judgment in favor of plaintiffs, especially since Your Honor

14 already ruled that payments under the education law, whether

15 made directly or indirectly for patient referrals, is a

16 violation of the no fault law.

17        So, in summary, Your Honor, we have all of this

18 evidence and nothing that creates a genuine dispute that these

19 payments violate the education law.  That's where plaintiffs

20 believe they're entitled to summary judgment.

21        By the way, Your Honor, the other defendants in this

22 case, Igor Dovman, he pled the Fifth Amendment and he invoked

23 the Fifth Amendment in response to every substantive

24 allegation in plaintiffs' complaint.  You would think that

25 Mr. Dovman would support Igor Mayzenberg.  He's the one that

1  supposedly provided the marketing and advertising expenses,

2  services.  Instead, he refused to oppose the motion for

3  summary judgment.

4           So if you put Igor Dovman and Igor Mayzenberg and

5  Tamilla Dovman together -- Tamilla Dovman is the third

6  defendant in this case.  She did not submit any evidence in

7  opposition to plaintiff's motion.  She didn't submit a sworn

8  affidavit.  She didn't submit any evidence.  What she did is

9  in response to plaintiffs' Rule 56 statement, she said to

10  virtually every material fact, she lacked knowledge and

11  information to provide a response.  The case law is clear that

12  that is insufficient and that Tamilla Dovman has been deemed

13  and should be deemed to have admitted all of the material

14  facts in plaintiffs' case.

15           So, in summary, Your Honor, I'll be happy to go on,

16  but there's a lot of evidence here and when you cut through

17  what the defendants are saying, ask them what particular facts

18  do they dispute.

19           There's nothing from Tamilla Dovman.  She says she

20  lacks knowledge.  She didn't want to find out what happened

21  here.  Her husband, Igor Dovman, was involved in the patient

22  kickback scheme.  She worked with him at his law office.  She

23  was married to him.  She was president on a number of the

24  shell companies.  She wants to bury her head in the sand and

25  say you can't get summary judgment against me.  That's not

1  appropriate under law.

2      Igor Dovman has defaulted on the motion for summary

3  judgment so that leaves Mr. Mayzenberg and the Mingmen

4  defendants and they have not submitted anything concrete,

5  anything genuine that amounts to a triable issue of fact to

6  dispute the litany of undisputed facts that I went through

7  with Your Honor.

8      THE COURT:  What you are saying, as I understand it,

9  is that circumstantially, there can be no doubt but that

10  payments were made by referrals directly and indirectly.

11  These payments were made by Mr. Mayzenberg directly to whom?

12      MR. SIRIGNANO:  The payments were made by both

13  Mr. Mayzenberg and some -- to a series of shell companies that

14  do not exist.  Mr. Mayzenberg, by the way, made the payments

15  not from his active company, Mingmen.  He made the payments

16  from two dormant companies to conceal those payments.

17      Mr. Mayzenberg concealed everything about this

18  scheme.  Those payments were made from dormant companies that

19  didn't actively provide any services to patients, yet he had

20  Mingmen Acupuncture as an active company but he didn't want to

21  have Mingmen pay for the patients.  He had his dormant

22  companies pay these shell companies that are associated with

23  Igor and Tamilla Dovman.  Those companies don't exist.  Those

24  companies don't provide marketing and advertising services.

25  Those companies are shell companies by everyone's account.

1    There's no debate about that.

2            Mr. Mayzenberg, by the way, not only paid out of

3    these defunct dormant companies.  When asked, in interrogatory

4    responses, who did you use for marketing and advertising in

5    this case, he said no one, because he didn't pay marketing and

6    advertising expenses.  He paid kickbacks for patient referrals

7    that he actively concealed over the course of years.

8            So while he wants to now say it's his understanding

9    that he was paying marketing and advertising expenses, there's

10   no, not a single fact, not a single shred of paper, there's no

11   flyers, there's no advertisements, there's nothing that he can

12   point to that says, I believe I was paying for marketing and

13   advertising.  How can he believe that when the names of the

14   companies he was paying are ML Garbage Company, MN Surgical

15   Supply?  He couldn't have believed it.

16           In the context of fraud and RICO, I understand,

17   Your Honor, that we need to prove intent on those but, first

18   of all, we have claims for declaratory judgment and claims for

19   unjust enrichment where intent is not a consideration.  If we

20   talk about the claims where intent is a consideration, yes,

21   common law fraud and RICO, plaintiffs have to demonstrate

22   intent, but the law is well settled that intent, particularly

23   in the fraud arena, is not proven by direct evidence.

24   Mr. Mayzenberg is not going to stand up and tell the Court,

25   yes, you're right, I was paying kickbacks and I was lying to

1    GEICO the whole time.

2           Fraud is proven through circumstantial evidence and

3    the evidence in here is overwhelming.  There's no other

4    conclusion that could be reached.  He just simply is saying

5    it's his understanding after lying in his interrogatory

6    responses, after paying monies out of concealed bank accounts,

7    after paying companies in the way he did by giving checks to

8    complete strangers which he claims he never knew who they

9    were, by writing checks that have blank memo lines, you know,

10   this practice and procedure, everything about it, it's beyond

11   raising any genuine issue for trial.

12          THE COURT:  How has your claim established that the

13   payments were for referrals and for nothing else?  How do you

14   make that connection?

15          MR. SIRIGNANO:  Mr. Mayzenberg repeatedly testified,

16   it's undisputed, that he made those payments only for one

17   reason:  That patients were sent to the clinics.  He

18   specifically said that if patients were not sent to the

19   clinics, I would not pay those companies.  And if patients

20   stopped being sent to the clinics by certain of the companies,

21   he testified, I stopped paying those companies.  Now, again,

22   he's saying it's his understanding that those were marketing

23   and advertising payments, but all accounts demonstrate it was

24   a direct payment for a patient referral.

25          Now, I also asked Mr. Mayzenberg at his deposition

1    to identify, how did he keep track of which patients were sent

2    in connection with which payments.  He said, I don't keep

3    track, I can't tell you, I have no records.

4           Well, you would think that someone who's paying

5    marketing and advertising expenses, first, would want to get

6    an invoice from one of the companies.  He never got an

7    invoice.  Second, you would want to see, see an advertisement

8    or a flier, something that they did.  They didn't give him any

9    of that.  He got nothing, zero, except his testimony is that,

10   I got sent patients.

11          So while I can't tell you which particular patient

12   was sent when, there is no dispute that Mr. Mayzenberg made

13   these payments and got patients sent to the clinics.

14          THE COURT:  Excuse me.

15          The services that were being billed for were for

16   acupuncture, is that right?

17          MR. SIRIGNANO:  Yes, Your Honor.

18          THE COURT:  Who was providing the acupuncture

19   services?

20          MR. SIRIGNANO:  Not Mr. Mayzenberg.  Mr. Mayzenberg

21   is the record owner of Mingmen Acupuncture.  That's the

22   company that was billing GEICO for acupuncture services.

23   Mr. Mayzenberg hired what we call treating acupuncturists to

24   provide these services and then Mr. Mayzenberg, although he

25   didn't treat patients, he then, you know, billed GEICO for

1  those services.

2          THE COURT:  Now, people came to Ming -- not "Ming"

3  but Mingmen.  Did they come to Mingmen?

4          MR. SIRIGNANO:  Yes, they went to Mingmen

5  Acupuncture.

6          THE COURT:  And who performed those services,

7  acupuncturists, certain independent contractors?

8          MR. SIRIGNANO:  We believe they're independent

9  contractors.  There's a dispute over that and I'll grant a

10 factual dispute as to whether they're actual W-2 employees of

11 Mingmen or they're independent contractors, but some treating

12 acupuncturist performed the services or allegedly performed

13 the services.

14         THE COURT:  Now, persons came to Mingmen for

15 acupuncture services?

16         MR. SIRIGNANO:  Yes.

17         THE COURT:  Did he indicate how it is that they came

18 there, who sent them there?

19         MR. SIRIGNANO:  No.  We asked Mr. Mayzenberg

20 repeatedly about all the payments to all of these different

21 companies that didn't do any advertising and marketing --

22         THE COURT:  Excuse me.  Excuse me.

23         When you say all of the different companies,

24 somebody comes to Mingmen for acupuncture services.  Does

25 anybody ask:  How did you get here?  Who are you?  Who

1  referred you?  What brings you here?  Did anybody ask that

2  question?

3          MR. SIRIGNANO:  Mr. Mayzenberg says no.

4          THE COURT:  Was Mr. Mayzenberg there when these

5  people were provided services?

6          MR. SIRIGNANO:  I asked Mr. Mayzenberg if he had any

7  records or if there was any way to tell how these patients got

8  to the clinics and he said no.

9          THE COURT:  Was Mr. Mayzenberg present at Mingmen or

10 was he absent?

11         MR. SIRIGNANO:  He was not present on a daily basis

12 but he claims to be the sole owner of Mingmen.  He claims to

13 have gone to the locations.  He claims to be in charge of the

14 management and operations of Mingmen.  He claims to be the

15 owner.

16         THE COURT:  Now, a person comes to Mingmen for

17 acupuncture services and services are provided by an

18 acupuncturist, is that right?

19         MR. SIRIGNANO:  Well, for purposes of this motion,

20 we're conceding that.  I mean, that's another issue but, yes,

21 acupuncture services are allegedly provided by the treating

22 acupuncturists and then a bill is generated and sent to GEICO

23 for those services.

24         THE COURT:  All right.  Now, what happens

25 thereafter?  Somebody, Mingmen or Sanli or Laogong or whoever

1  it is, then gets money from Mayzenberg?

2        MR. SIRIGNANO:  Unfortunately, Your Honor, it's not

3  that simple because of the deception and concealment.  We have

4  tried over the course of years to get specifics about how the

5  patient referral system worked and we don't know if

6  Mr. Mayzenberg was paying for patient referrals after the

7  patients came or whether it was in advance of the patients

8  being referred to the clinic.  There's somewhat confusion on

9  that.

10        THE COURT:  Who was he paying?  Who are the checks

11  being paid to?

12        MR. SIRIGNANO:  The checks were being paid to a

13  series of companies that we call the Dovman shell companies.

14  These are a series of companies that listed either Igor Dovman

15  as the president or Tamilla Dovman as the president and those

16  companies had no actual operations and they had different

17  names and they had different names for a reason.  He was

18  paying a whole series of these companies:  Crick Medical

19  Testing, ML Garbage Removal, MN Surgical Supplies, Robert

20  Consulting, Trim VR Services.  There's a whole list of

21  companies that Mr. Mayzenberg would pay, as he said, to send

22  patients to the clinic.

23        He testified specifically, when I asked him about ML

24  Garbage Removal, that company, I said why are you paying a

25  company called ML Garbage Removal for referrals of patients.

1    He said, I will pay any company, I will pay a garbage company,

2    as long as the garbage company refers patients to my clinics,

3    I will pay them.  That's what he said.

4         So I can't give you specifics but I know he knows he

5    paid these companies for patient referrals.

6         THE COURT:  Now, am I understanding that there is a

7    deposition at which Mr. Mayzenberg was asked why have you paid

8    X dollars to Y company and he said because they referred

9    patients to him?

10        MR. SIRIGNANO:  Yes.  He said, I will pay any

11   company that sends patients to my clinics.  That's what he

12   said.

13        Then he characterized -- during the same deposition,

14   he then characterized it, well, I'm -- they must be providing

15   advertising and marketing services.  Then I said, Well, what

16   advertising and marketing services?  He said, It must be

17   flyers.  I said, Do you have any of those?  No.  You've been

18   making these payments over the course of two years, you paid

19   $389,000 over the course of two years to a series of 13

20   different companies, do you have a single piece of paper

21   showing anybody performed marketing and advertising services?

22   No.  Did you ever get an invoice from any one of these

23   companies saying they provided services to you?  No.  Why did

24   you pay them, Mr. Mayzenberg?  Because they sent patients to

25   my clinics.

1        THE COURT:  Now, you made some observation that

2    payments were being made directly and indirectly.  What were

3    the indirect payments?  How did that come about?

4        MR. SIRIGNANO:  No, Your Honor.  I made reference to

5    the New York State education law which is the statute, one of

6    the statutes, there's a number of them, that prohibits paying

7    for patients.  That statute, by its own language, makes it --

8    it prevents providers from making payments and the term is

9    payments directly or indirectly for patient referrals.  And I

10   think what that statute is intended to do is to actually

11   address the type of behavior that Mr. Mayzenberg is engaging

12   in.

13        He's saying, Well, wink, wink, it's for marketing

14   and advertising, but we know if it's not a direct payment for

15   a patient referral, it's clearly an indirect payment.  That's

16   what the New York statute is saying, that you can't make a

17   payment for a patient referral.  You can't even offer to make

18   a payment for patient referral.  That's what the education law

19   says.  And those payments, whether they're made for a direct

20   patient referral or indirect patient referral, are still

21   prohibited under the law.

22        THE COURT:  Is there anything else?

23        MR. SIRIGNANO:  Just quickly, I wanted to mention

24   the Igor Dovman and Tamilla Dovman portion of it because I

25   think Igor Dovman, who is the other main defendant in this

1    case who supposedly was providing the marketing advertising

2    services, he pled the Fifth Amendment and he refused to

3    respond to any of the substantive allegations in the

4    complaint.  And under the law, an adverse inference, a

5    negative inference should be drawn against the other parties

6    to this case, Mr. Mayzenberg and Tamilla Dovman.

7               Under U.S. v. LiButti, the critical question is

8    whether that negative inference is trustworthy under the, you

9    know, for the search of truth.

10              Here, if you look at all the ample evidence that we

11   have and the lack of any documentation, the fact that Mr. Igor

12   Dovman invoked the Fifth Amendment and concealed the fact that

13   he was getting all of these monies is significant evidence and

14   I think that, in addition to everything else, should add to

15   the weight of the evidence and the imposition of summary

16   judgment in plaintiff's favor against all of the defendants.

17              THE COURT:  How does Tamilla Dovman come into this

18   picture?

19              MR. SIRIGNANO:  Tamilla Dovman obviously is

20   Mister -- excuse me -- she's Mr. Dovman's wife.  She worked

21   out of the same Coney Island law office that Mr. Dovman worked

22   out of, as well as two personal injury lawyers who were the

23   ones involved in obviously handling automobile accident cases.

24   And Mr. Mayzenberg and his companies specialized in treating

25   individuals injured in automobile accidents.

1          Now, at this law office, Tamilla Dovman now claims

2     to be just a paralegal, but she was there with her husband and

3     with these two other lawyers.

4          The one lawyer, David Feinerman, was disbarred for

5     improper conduct in connection with his clients' settlement

6     funds for a period of time.  He then got reinstated.

7          Another lawyer, Daniel Corley, invoked the Fifth

8     Amendment.  When we asked Mr. Corley were you involved in a

9     patient kickback scheme with the other defendants in this

10    case, he refused to answer it.  This is a lawyer admitted to

11    the State of New York.  Why would he have a reason other than

12    the fact that he's implicated in the patient kickback scheme?

13    He would have no reason to invoke the Fifth Amendment other

14    than the fact that he was aware of and guilty and involved in,

15    at that law office, the patient kickback scheme.

16         That's where Tamilla Dovman worked and she was at a

17    law office, Tamilla Dovman, with her husband, with these

18    lawyers.

19         The companies that I talked about that got the money

20    for Mr. Mayzenberg, there's a whole series of them, Tamilla

21    Dovman was the president of three of them.  Two of those

22    companies were directly paid monies by Mr. Mayzenberg.  Okay?

23    So she was getting monies as the president of shell companies.

24    These companies don't exist.  These companies have no

25    operations.  These companies provide no services.  Yet, she

1  was the president of those companies.  She also made transfers

2  of funds to those companies.  She endorsed checks.

3  Now, her liability in this case is just as a

4  co-conspirator under RICO and under RICO, the conspiracy

5  statutes, the co-conspirator doesn't have to commit all

6  aspects of the fraudulent scheme.  They just have to have

7  general knowledge of the scheme and commit portions of the

8  act.  She clearly is a co-conspirator under RICO.  So that's

9  her involvement.

10  Just for Your Honor's own information, when we moved

11  for summary judgment on these, you would think that Tamilla

12  Dovman would have some innocent explanations for her being

13  listed as the president of companies that don't have any

14  operations.  You would think she would have some instant

15  explanation as to why she was endorsing checks to these shell

16  companies, why she worked at this law office.  She submitted

17  nothing.  No affidavit.  She submitted no -- she didn't

18  dispute any of the material facts in our Rule 56 statement.

19  She didn't conduct any discovery in the case.  She wants to

20  bury her head in the sand and say I didn't know who was going

21  on.  She didn't want to know what was going on.

22  She purposely avoided trying to get involved in the

23  ultimate payments, but she was listed as president, she was

24  actively involved and she didn't give any explanation and

25  under those circumstances, you can't defeat a summary judgment

1   motion just by saying, hey, I didn't know what was going on,

2   period.

3           So what we have, in summary, Your Honor, I'll sit

4   down now, is that Mr. Mayzenberg's main defense in this case

5   is I had an understanding that they were payments for

6   marketing and advertising with no supporting back up.  Tamilla

7   Dovman's defense to the summary judgment motion is I didn't

8   know what was going on with no supporting facts or evidence.

9           THE COURT:  Thank you.

10          MR. SIRIGNANO:  Thank you, Your Honor.

11          THE COURT:  Ms. Maylov, did you want to be heard on

12  behalf of your client?

13          MS. MAYLOV:  Yes, Judge.

14          THE COURT:  Please.

15          MS. MAYLOV:  Well, plaintiff's counsel just stated

16  here that Tamilla Dovman worked with Igor Dovman at his law

17  office and she testified at her deposition that she worked at

18  the law office of Daniel Corley and Mr. Feinerman.  Her

19  husband, as far as she knows, doesn't own a law office.  They

20  share the same building.  The law office is on the second

21  floor and Mr. Dovman rented space on the third floor of the

22  same building on Coney Island Avenue in Brooklyn.

23          The statement that she worked for her husband is a

24  just a pure insinuation by plaintiff's counsel.  She came to

25  the deposition.  Shy provided her income taxes in discovery.

1    It shows where she worked, who she worked for and, yes, she

2    didn't know the answer to some questions, but she clearly

3    stated on the record that she wasn't involved in any scheme to

4    defraud GEICO.  She actually answered that question on the

5    record.

6          I mean, she is related to her husband, she's his

7    wife, but whether there's any conduct by Mr. Dovman that she

8    testified that she had no knowledge of doesn't make her a

9    party to conspiracy.  Actually, the attorneys that she worked

10   for, Mr. Corley and Mr. Feinerman, never had personally as an

11   attorney referred or paid a kickback to Mr. Mayzenberg or

12   otherwise from Mr. Mayzenberg to them for referral of

13   patients.  There is not one client of theirs who's a patient

14   of Mr. Mayzenberg as far as our understanding.  GEICO has not

15   provided any proof that there was kickback by these two

16   attorneys.

17         Now, the payments were made by Mr. Mayzenberg to

18   shell companies and we don't know what the payments were for

19   other than Mr. Mayzenberg's testimony that it is for

20   advertising and referral.  So there is no other proof that

21   it's a kickback scheme to defer GEICO.  So my client had

22   nothing to do with the defrauding of GEICO.  She hasn't billed

23   GEICO directly.  I don't know if she had the benefit of any

24   payments from the two or three companies that she's been a

25   president of and was a signatory on the bank account.  So her

1  involvement in the scheme is not existent, Judge.

2  THE COURT:  What did these companies that she was

3  the president of do?  Did they have some function?  Did they

4  have some business?

5  MS. MAYLOV:  As far as my client testified, she had

6  some limited knowledge.  She didn't know what exactly

7  happened, she knew funds were put in and she knew other funds

8  were taken out by making payments to other companies.

9  THE COURT:  Who created these shell companies?

10  MS. MAYLOV:  I mean, I believe she did.  I believe

11  she was the president of the three companies.

12  THE COURT:  Who created the companies, she did?

13  MS. MAYLOV:  Yes.

14  THE COURT:  For what purpose?  She was a paralegal,

15  was she, at a law office?

16  MS. MAYLOV:  Yes.

17  THE COURT:  That was her primary job?

18  MS. MAYLOV:  It was her primary job.

19  THE COURT:  What was the purpose in creating a shell

20  company; the company's incorporation?

21  MS. MAYLOV:  Yes, they are.

22  THE COURT:  So she must have gone to a lawyer and

23  asked the lawyer to form a corporation for her, that she would

24  be the president of the company.  What was her purpose in

25  doing that?

1          MS. MAYLOV:  Well, some of these companies were

2    created that she, as an independent contractor, could be paid

3    for the services she provided to attorneys.

4          THE COURT:  My question is what was the purpose for

5    the creation of these corporations which had no function

6    whatsoever except to be in existence.  What was her purpose?

7          MS. MAYLOV:  Well, I don't know what the purpose is

8    but it wasn't the purpose of defrauding GEICO.

9          THE COURT:  Did it have any purpose at all?  Did it

10   have any function at all?

11         MS. MAYLOV:  I can't answer that question today,

12   Judge.

13         THE COURT:  It received money?

14         MS. MAYLOV:  They have received money.

15         THE COURT:  From Mr. Mayzenberg?

16         MS. MAYLOV:  Some of these companies, yes.

17         THE COURT:  And did Mr. Dovman inquire as to why

18   Mr. Mayzenberg was sending her company money?  The checks were

19   going to her as the president of the company?

20         MS. MAYLOV:  Well, there was a referral for, you

21   know, advertisement and there was a payment for advertisement

22   according to Mr. Mayzenberg.

23         THE COURT:  Well, was Ms. Dovman in the advertising

24   business or was she a paralegal?

25         MS. MAYLOV:  She was a paralegal.

1          THE COURT:  And she was being paid for advertising

2    services?

3          MS. MAYLOV:  I can't answer that question, Judge.

4          THE COURT:  Is there anything else you would like to

5    say to me?

6          MS. MAYLOV:  No.  Thank you.

7          THE COURT:  Thank you very much.

8          Mr. Conroy?

9          MR. CONROY:  Thank you, Your Honor.

10          I'm going to make reference to an exhibit to the

11    plaintiff's motion for summary judgment and I've taken the

12    liberty of making a larger photocopy of part of their expert's

13    report and I have a copy for Your Honor if you can't clearly

14    see this one.  I'd be happy to hand it up.

15          THE COURT:  What is the purpose of this?  What's the

16    relevance of this?

17          MR. CONROY:  Your Honor, this is a flow chart that

18    describes the scheme to defraud as alleged by GEICO and as set

19    forth in GEICO's forensic accountant's expert report and it

20    purports to show the flow of money from Mingmen, the treating

21    acupuncture PC, to Dr. Mayzenberg and then on to

22    Dr. Mayzenberg's other companies, Sanli and Laogong, and then

23    to the Dovman shell entities.

24          My issue in this case and the basis for my motion

25    and my opposition to the plaintiff's motion is the last

1    segment of the flow chart where it shows money going from the

2    Dovman shell entities to the patients or for the referral of

3    patients and what I submit to Your Honor is that there is no

4    evidence, there is just an absence of evidence as to what the

5    kickback scheme was.  It's GEICO's burden.  It's their case.

6    They can't even explain or allege what the kickback scheme is.

7    They just say we paid Dovman for the referral of patients.

8             Over the course of eight years --

9             THE COURT:  Excuse me.

10            MR. CONROY:  Yes, Your Honor.

11            THE COURT:  As I understand it, Counsel has said

12   that Mr. Mayzenberg was asked whether he paid these shell

13   companies for the referral of patients and Mr. Mayzenberg said

14   yes.  That's what I thought I heard the attorneys say.  And

15   apparently that's in response to a deposition question and

16   answer.

17            MR. CONROY:  Your Honor, that section of the

18   deposition, Mr. Mayzenberg is answering questions about his

19   belief he was paying monies for advertising and marketing.  He

20   specifically said he never engaged in any kickback scheme.

21            The general motion that plaintiffs have put forth is

22   that any payment to any person of any formula results in a

23   patient going to a medical practice is in the form of a

24   kickback and that is a gross oversimplification in a broad

25   brush stroke to say that all monies paid constitute kickbacks.

1    That's simply not the case.

2           A kickback, as we understand it, you can pay

3    directly to a patient.  That's a kickback.  Pay a runner,

4    that's a kickback.  Paying the attorney to bring that patient,

5    that could be a kickback.  The plaintiffs don't say what are

6    the Dovman shell entities doing with this money.  Are they

7    paying lawyers, patients, runners, other doctors?  There's no

8    evidence of where the money goes after Dovman.  There's none.

9           There were 1,3398 patients that were treated by the

10   Mayzenberg PC's.  GEICO has access to all of these people and

11   they spoke to many of them.  There's not one statement about

12   one patient about why they were treated at Mayzenberg clinic.

13   There's no evidence that any lawyer sent them, that any lawyer

14   sent them, that Dovman sent them, that they were paid money.

15   There's no evidence whatsoever.  This is a fiction.

16          I agree that three-quarters of it gets filled out.

17   I don't dispute the fact that the money was paid from Mingmen

18   to Mayzenberg to Sanli and then it made its way to the Dovman

19   shell entities, but there's simply no evidence that any of

20   this money went specifically for the referral of any GEICO

21   patient.  What GEICO is trying to do is take one line from

22   Mr. Mayzenberg's deposition and say he admitted, he admitted

23   that these payments were for the referral, the illicit or

24   illegal referring.

25          Mr. Mayzenberg does not speak English as a first

1    language.  He's of Ukranian descent.  He says, I paid money

2    for the patients, to get the patients, but at the same time

3    says through marketing and advertisement.  In his mind, in his

4    words, as it shows up in the deposition transcript, when I pay

5    money for advertisement, that means my patient come to my

6    clinic.  That's a very different situation from paying a

7    runner, paying a lawyer, paying someone to illegally refer or

8    to accept a kickback for referral of the patient.  That really

9    specifically is what this case at this stage is about.

10         I would also point out that on the issue of the

11    negative impulse, LiButti actually had several factors as to

12    whether or not it's appropriate to imply negative inference

13    from one party against other parties and those four factors do

14    not fall in favor of GEICO in this case.

15         There's virtually no evidence that Mr. Mayzenberg

16    and Mr. Dovman even knew each other.  There is scant

17    communication between then at any one time in time.  There are

18    checks being made out to these companies but Mr. Mayzenberg

19    testified that did he not know Mr. Dovman and that this was

20    just an arrangement that came through one of the clinics and

21    he left the checks blank and someone filled in the names.

22         THE COURT:  Excuse me.  An arrangement came through

23    one of the clinics?  What clinic are you referring to?

24         MR. CONROY:  Mayzenberg's PC operated out of

25    different locations.  Two of them were in Brooklyn.  One of

1  them was in the Bronx.  It could have been the three that were

2  in Brooklyn.

3       THE COURT:  Who provided the acupuncture services at

4  these various clinics?

5       MR. CONROY:  The employee acupuncturists of the

6  PC's.

7       THE COURT:  They were employees?

8       MR. CONROY:  They were employees, K2.  He hired

9  them.  He paid them on W-2.  Some of them were paid beyond the

10  W-2s for what he described as other services for which he paid

11  them through his other PCs, but they were payroll, salaried

12  payroll of those PCs.

13       THE COURT:  I thought I heard that Mr. Mayzenberg

14  had made somewhere in the neighborhood of

15  300 some-odd-thousand dollars from these various shell

16  companies, is that right?

17       MR. CONROY:  Over the period of roughly 18 months.

18       THE COURT:  He paid 300-some-odd-thousand-dollars?

19       MR. CONROY:  I believe it's 389,000 to a series of

20  companies.

21       THE COURT:  And was Mr. Mayzenberg's explanation

22  that some $300,000 was paid for marketing services?

23       MR. CONROY:  Marketing.

24       THE COURT:  What does marketing mean?  What does

25  marketing mean?  What was he paying for that he would say was

1   for marketing?

2          MR. CONROY:  I would -- I don't believe that there

3   is evidence in the summary judgment.

4          THE COURT:  I'm not asking about evidence.  I'm

5   asking you, sir.

6          MR. CONROY:  What I believe marketing activities

7   would be?

8          THE COURT:  What did Mr. Mayzenberg understand that

9   he was paying for in terms of marketing?

10         MR. CONROY:  Marketing a practice or clinic

11  location.

12         THE COURT:  He was paying these shell companies for

13  marketing 300 some-odd-thousand-dollars in a period of

14  18 months.  Is that what I'm hearing?

15         MR. CONROY:  Your Honor, $389,000 sounds like a lot

16  of money and it is, but in the context of companies like

17  these, these are --

18         THE COURT:  I'm sorry.  How did Mr. Mayzenberg get

19  to know these shell companies?  How did that come about?

20         Did they solicit Mr. Mayzenberg for business and

21  say, Mr. Mayzenberg, we will advertise your acupuncture

22  clinics for you?

23         And by the way, is there some prohibition, legal

24  prohibition for medical providers to pay for advertising for

25  patients?  Is this something --

1          MR. CONROY:  Your Honor, if you ask GEICO, they

2     would certainly say that's prohibited as a kickback.

3          THE COURT:  I'm asking you.

4          MR. CONROY:  I'm telling that you there isn't.

5          THE COURT:  There is not?

6          MR. CONROY:  There is not.  There is what amounts to

7     be a disciplinary rule that prohibits direct or indirect

8     patient referral payments and that is codified as 8NYCRR29.1.

9     That statute has been on the books a very long time.

10          There is virtually no case law on this statute of

11     any kind and there is a, I believe either an Education

12     Department or an Insurance Department opinion letter about

13     this that is roughly 30 years old that is contained in the

14     plaintiff's motion which essentially says -- we were asked a

15     question, we're going to give a general answer.

16          The question was is it a violation of the

17     anti-referral statute to pay a medical referral service,

18     entities, to list the medical provider to a geographic area of

19     potential patients.  The opinion letter goes on to describe

20     instances where they believe it would be or wouldn't be a

21     violation and what they conclude in that letter is that unless

22     the patient is being paid, it would not be a violation if you

23     listed in the medical referral service marketing arrangement.

24          THE COURT:  All right.  Mr. Mayzenberg --

25          MR. CONROY:  This is what the plaintiff relies on to

1  make this case.

2      THE COURT:  Mr. Mayzenberg paid somewhere in the

3  neighborhood of $390,000 to a number of companies for

4  advertising.  Let's leave marketing out for a moment.

5      Did Mr. Mayzenberg have any sample of what it was

6  that was being advertised that they provided to

7  Mr. Mayzenberg?

8      MR. CONROY:  He did not.

9      THE COURT:  With copies of the advertisements that

10  he was paying for?

11      MR. SIRIGNANO:  He did not.

12      THE COURT:  And so he was paying

13  390 some-odd-thousand dollars for advertising that he never,

14  never asked for, never provided to him.

15      Now, Mr. Mayzenberg was paying these collections to

16  companies that he had no other relationship with in terms of

17  services except marketing and advertising?

18      MR. CONROY:  In fairness, Your Honor, Mr. Mayzenberg

19  actually left checks that were filled out, where the dollar

20  number was filled out and he signed the check, but someone

21  else filled in the payer portion of the check.

22      THE COURT:  You mean the payee?

23      MR. CONROY:  I'm sorry.  The payee, correct.

24      THE COURT:  Who did that?

25      MR. CONROY:  Well, the evidence in the record would

1   indicate that most of the payee lines were filled in by

2   Equaduct and I have no handwriting expert to contradict that.

3          THE COURT:  Did Tamilla Dovman?  Did Tamilla Dovman

4   fill out the payee line?

5          MR. CONROY:  I'm not aware of any evidence to

6   suggest that.

7          THE COURT:  And were these checks endorsed?  They

8   would be endorsed for purposes of being deposited?

9          MR. SIRIGNANO:  I'm fairly confident saying that the

10  checks were endorsed.

11         THE COURT:  By?

12         MR. CONROY:  Your Honor, at this point, I'm drawing

13  my memory of the plaintiff's second expert report which I did

14  not rebut, but my understanding of the report in general is

15  there was fairly detailed evidence that the checks had Igor

16  Dovman's handwriting on them.  I don't believe Tamilla

17  Dovman's handwriting appeared on any of the checks and I'm

18  fairly confident that Mr. Mayzenberg never filled out any of

19  the payee portions of those checks.  But as to what the

20  specific endorsements on the back of those checks were, I

21  cannot speak, speak with accuracy on that.

22         THE COURT:  Well, Mr. Mayzenberg was preparing,

23  signing blank checks to be paid, filled out by somebody who he

24  didn't know who was going to fill in the payee but he was

25  assuming that it was for advertising services?

1          MR. CONROY:  Yes.

2          THE COURT:  Yes?

3          MR. CONROY:  That's correct.

4          THE COURT:  Thank you very much.

5          Is there anything else?

6          MR. CONROY:  That's it.

7          THE COURT:  Thank you.

8          Is there anything further?

9          MR. SIRIGNANO:  I guess very briefly, Your Honor,

10   two things on the law.

11          First, monies paid for passive marketing advertising

12   are perfectly legitimate and the opinion letter that

13   Mr. Conroy references does indicate that, but it also makes

14   clear that payments that are intended for referrals and

15   recommendations by a for-profit entity are prohibited under

16   the New York Public Health Law.  So there's a difference

17   between, you know, a passive advertisement and actively

18   sending patients to clinics.

19          And Mr. Mayzenberg didn't say it was passive

20   advertising.  He said it was to send patients to clinics.  He

21   said if garbage removal company can find people, people and

22   garbage there and send them to the clinic, I don't care how

23   garbage companies are called.  Another question:  So this

24   company Green BH was able to generate more patients for your

25   practices?  I think so.

1      THE COURT:  Who were the payees named in these

2  checks?

3      MR. SIRIGNANO:  There's a series of shell companies

4  and there is more than 15 of them and as I mentioned before,

5  Your Honor, the names of those companies include companies

6  like JER -- this one was the only advertising company -- JER

7  Advertising and Consulting.  There's Green BH, Inc., there's

8  Cornell Plus Inc., there's Crick Medical Testing, there's ML

9  Garbage Removal, there's MN Surgical Supply, Rig Testing, and

10  a whole series of other companies.

11      THE COURT:  And those payees' names were not filled

12  in by Mayzenberg but the checks were prepared in blank and

13  then the payee's name was filled in by some person?

14      MR. SIRIGNANO:  Correct.  And he got a call from

15  someone he didn't know to actually pick up the checks.  So the

16  whole thing, there's just no actual evidence or even a shred

17  of evidence that suggests that any kind of marketing and

18  advertising was performed.

19      THE COURT:  Thank you very much.

20      MR. SIRIGNANO:  Thank you, Your Honor.

21      THE COURT:  All right.  Thank you.  Thank you very

22  much.

23      MR. CONROY:  Thank you, Your Honor.

24      MR. SIRIGNANO:  Thank you, Your Honor.

25      (Matter concluded.)